IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2023 Term

_____

No. 22-0002

_____

FILED

June 15, 2023

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

JUSTICE HOLDINGS, LLC,
Plaintiff Below, Petitioner,

V.

GLADE SPRINGS VILLAGE PROPERY OWNERS ASSOCIATION, INC.
Defendant Below, Respondent.

_____

Appeal from the Circuit Court of Raleigh County
The Honorable Robert A. Burnside, Judge
Civil Action No. 19-C-481

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART,
AND REMANDED

_____

Submitted: April 25, 2023
Filed: June 15, 2023

Shawn P. George, Esq.                    Mark A. Sadd, Esq.
Jennie O. Ferretti, Esq.                 Ramonda C. Marling, Esq.
George & Lorenson                        Lewis Gianola PLLC
Charleston, West Virginia                Charleston, West Virginia
Attorneys for the Petitioner             Attorneys for the Respondent

Bryan N. Price, Esq.
William J. Aubel, Esq.
Flaherty Sensabaugh Bonasso PLLC
Charleston, West Virginia
Arie M. Spitz, Esq.
Clayton T. Harkins, Esq.
Dinsmore & Shohl LLP

Charleston, West Virginia
Attorneys for Amicus Curiae, Elmer
Coppoolse, James Terry Miller, and B.
Elaine Butler

JUSTICE BUNN delivered the Opinion of the Court.

JUSTICE HUTCHISON and JUSTICE WOOTON, deeming themselves disqualified, did not participate.

JUDGE BRIDGET M. COHEE and JUDGE GREGORY L. HOWARD, JR., sitting by temporary assignment.

JUSTICE ARMSTEAD and JUDGE GREGORY L. HOWARD, JR. concur, in part, dissent, in part, and may file separate opinions.

# SYLLABUS BY THE COURT

1. "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York,* 148 W. Va. 160, 133 S.E.2d 770 (1963).

2. "Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Syllabus point 2, *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 459 S.E.2d 329 (1995).

3. Based on the plain language of the statute, when an association terminates a contract "without penalty" under West Virginia Code § 36B-3-105, that termination ends the parties' rights and responsibilities at the time of the termination.

4. Termination pursuant to West Virginia Code § 36B-3-105(ii) is prospective, such that amounts previously and properly paid by an association under the contract cannot be recouped by the association. The plain language of the statutory

i

termination provision dictates that the contract ends, at the option of the association, without penalty to the association.

5. "Although our standard of review for summary judgment remains de novo, a circuit court's order granting summary judgment must set out factual findings sufficient to permit meaningful appellate review. Findings of fact, by necessity, include those facts which the circuit court finds relevant, determinative of the issues and undisputed." Syllabus point 3, *Fayette County National Bank v. Lilly*, 199 W. Va. 349, 484 S.E.2d 232 (1997), *overruled on other grounds by Sostaric v. Marshall*, 234 W. Va. 449, 766 S.E.2d 396 (2014).

BUNN, Justice:

Petitioner Justice Holdings, LLC ("Justice Holdings"), appeals numerous orders of the Circuit Court of Raleigh County concerning the Glade Springs Village ("GSV") community. For many years, Justice Holdings, as the developer of GSV, controlled the Glade Springs Village Property Owners Association, Inc. (the "Association") and selected the Association's Board of Directors (the "Board"). In 2019, instead of a Board selected solely by Justice Holdings, the GSV lot owners elected the Board. This appeal emerges from ongoing litigation between Justice Holdings and the Association.[1] While Justice Holdings raises many assignments of error on appeal, its arguments focus on three issues: (1) whether the circuit court erred in finding that the Uniform Common Interest Ownership Act (the "Uniform Act"), Chapter 34B of the West Virginia Code, applied to GSV; (2) whether the circuit court erred in granting summary judgment to the Association on its declaratory judgment action seeking a determination that a loan had been terminated with no equitable remedies; and (3) whether the circuit court erred in finding that Justice Holdings owed funds to the Association, including more than $6 million in assessments to the Association and a reimbursement of a payment related to the loan.

---

[1] We recently addressed an appeal by the Association in the same litigation in *Glade Springs Village Property Owners Association, Inc. v. Justice Holdings, LLC*, No. 22-0003, 2023 WL 2784814 (W. Va. Apr. 5, 2023) (memorandum decision). There, we upheld the circuit court's dismissal of the Association's claims against Justice Holdings brought pursuant to the West Virginia Consumer Credit and Protection Act, West Virginia Code §§ 46A-1-101 to 46A-8-102. *Id.* at *4.

We conclude, as explained below, that the circuit court correctly determined that the Uniform Act applied to GSV. We further conclude that the circuit court, while it improperly expanded the impact of its holding, did not err when it granted summary judgment regarding the termination of the Association's loan with Justice Holdings. Finally, with respect to the assessments and other funds, we reverse, in part, vacate, in part, and remand those issues to the circuit court, because the order is insufficient to allow us to conduct adequate appellate review.[2]

## I.

## FACTUAL AND PROCEDURAL HISTORY

Glade Springs Village ("GSV") is a residential development established in May 2001 when Cooper Land Development ("Cooper Land"), as the developer, recorded the 2001 GSV Declaration ("GSV Declaration" or "Declaration") in the Office of the Clerk of the County Commission of Raleigh County, West Virginia. In conjunction with the creation of GSV, Cooper Land also created the Glade Springs Village Property Owners Association, Inc. (the "Association"), a nonprofit corporation. The GSV Declaration set forth the operating procedures for the development, including the developer's responsibilities, the Association's duties, and the Association's members' responsibilities.

---

[2] This Court acknowledges the participation in this case of the former Association Board members who filed an amicus curiae brief. We appreciate their participation in this appeal and have considered their arguments in deciding the issues.

Initially, the Declaration bound only one acre of land owned by Cooper Land. The Declaration contemplated a residential and commercial community with utility systems, recreational facilities, and common properties for the use and benefit of the community. At the time Cooper Land created GSV, Glade Springs Resort already existed and included a housing development known as "Phase I." Some lots in Phase I, as well lots in another nearby development called "The Farms," eventually became associated with GSV.

In 2010, Justice Holdings purchased Cooper Land's interests and succeeded it as the developer of GSV.[3] Cooper Land transferred several unsold lots to Justice Holdings, along with reserved land and its rights as the developer under the Declaration. Cooper Land also conveyed its interest in a Utilities Loan between the Association and Cooper Land, described in more detail below.

### A. The Uniform Act

To understand the facts, legal issues, and parties' roles, we provide a brief introduction to the Uniform Act, a comprehensive law that applies to certain "common interest communities" in West Virginia. *See* § 36B-2-101 (eff. 1986). A "common interest

---

[3] Documents in the record indicate that James C. Justice Companies, Inc. entered into a purchase agreement with Cooper Land and then that corporation assigned its rights, duties, and obligations under the purchase agreement to Justice Holdings.

3

community" is "real estate with respect to which a person, by virtue of his ownership of a unit, is obligated to pay for real estate taxes, insurance premiums, maintenance or improvement of other real estate described in a declaration . . . ." W. Va. Code § 36B-1-103(7). The four articles of the Uniform Act in Chapter 36B of the West Virginia Code set forth detailed rights and responsibilities of parties involved in creating, developing, and owning property in common interest communities. *See* W. Va. Code §§ 36B-1-101 to 36B-4-120. A common interest community is created "only by recording a declaration executed in the same manner as a deed" which "must be recorded in every county in which any portion of the common interest community is located . . . ." W. Va. Code § 36B-2-101(a). While the Act provides for annual assessments of unit owners, except in certain limited situations, common expenses "must be assessed against all the units" by an allocation in the declaration, W. Va. Code § 36B-3-115, and the allocations "may not discriminate in favor of units owned by the declarant or an affiliate of the declarant," W. Va. Code § 36B-2-107(b). The Legislature provided that the Uniform Act "applies to all common interest communities" created within West Virginia after July 1, 1986. *See* W. Va. Code § 36B-1-201. Unless expressly provided by the Uniform Act, the Act's provisions "may not be varied by agreement, and rights conferred may not be waived." W. Va. Code § 36B-1-104. Furthermore, "[a] declarant may not act under a power of attorney, or use any other device, to evade the limitations or prohibitions of [Chapter 36B of the West Virginia Code] or the declaration." *Id.*

4

### B. The GSV Declaration

The GSV Declaration provided that the Association was "authorized, but not obligated, to provide any and all municipal-type services" to the common areas of GSV. The Declaration also directed that the "cost of installation of water and wastewater mains and fire hydrants to serve the Lots and homes" were to be paid from Association assessments and from charges to lot owners at the utility rates.[4] The Declaration additionally authorized the Association to set and collect assessments, described further below.

The Declaration also provided that a Board of Directors (the "Board") managed the Association. Class membership determined control of the Board: every person or entity who owned a lot in the development had "Class A" membership in the Association, while the developer had "Class B" membership. The developer, with its Class B membership, was "solely entitled to appoint the members" of the Association's Board until either the developer sold its "remaining inventory" and "its active sales and marketing effort is discontinued" or when the developer "in its sole discretion" converted its membership into Class A membership. Once the developer converted its membership, the Class A members, including the developer and lot owners, elected the directors.

---

[4] Although the Uniform Act refers to the property subdivisions in a common interest community as a unit, throughout this litigation the parties have typically referred to the GSV units as lots. While the GSV Declaration treated owners of lots and "living units" similarly, for simplicity we refer to the divided property subject to the GSV Declaration as lots for the purpose of this Opinion.

The Declaration required lot owners to pay annual assessments and special assessments to the Association. Annual assessment funds promoted "recreation, health, safety and welfare" of the owners and the Association used those funds for the "construction, leasing, improvement and maintenance of properties, services and facilities devoted to this purpose and related to the use and enjoyment" of the common property of GSV.[5] The Declaration provided that the annual assessment also paid for improvements at GSV, including the "construction and installation of the water distribution system and sewer collection system" and other maintenance requirements.

By purchasing a lot or accepting a deed, the lot owners "covenant[ed] and agree[d]" to pay the annual and special assessments. Important to this appeal, the Declaration provided that lots held by the developer prior to the initial sale or contract to sell ("Inventory Lots") were exempt from assessment. This opinion refers to those Declaration provisions exempting developer lots from assessments as the "Exemption Provisions."

---

[5] The Declaration described common property as:

> any property, real, personal or mixed, owned or leased by the Association or in which the Association otherwise has possessory or use rights, those areas reflected as such upon any recorded subdivision plat of [GSV], and those areas so designated from time to time by the Developer and intended to be devoted to the common use and enjoyment of the Members."

The Declaration established that rates for assessments could increase over time. While the Declaration set the first annual assessment at $630, the annual assessment could increase at a rate of up to five percent or the increase in the Consumer Price Index for the past twelve-month period, whichever was larger, by a majority vote of the Association's Board and without a vote of the membership. A majority vote of members of each class of voters also could vote to raise the assessment by any amount, "without limitation." During the period relevant to this appeal, the Board increased the annual assessment by five percent yearly. The Declaration did not require the Association to set a yearly budget or provide for disbursement of excess funds.

### C. Justice Holdings's Purchase of GSV and its Conversion of its Voting Rights to Class A Membership

Cooper Land sold its developer interest in GSV to Justice Holdings in October 2010. As the successor developer to Cooper Land, Justice Holdings then chose the members of the Board ("Justice Board"). Like its predecessor, Justice Holdings did not pay assessments on the Inventory Lots it held at GSV. It also took over the Utilities Loan, as discussed below. Justice Holdings also held lots in GSV that had previously been sold and were no longer Inventory Lots subject to the Exemption Provisions.

Justice Holdings eventually changed the designation of its membership in the Association from Class B to Class A.[6] As a result, Justice Holdings no longer possessed sole discretion to select Board members. In April 2019, the Class A members exercised their newly gained powers to elect a Board ("Elected Board") no longer controlled by the developer. Those Board members took office on May 1, 2019.

### D. The Utilities Loan

On July 1, 2001, Cooper Land entered into a loan agreement ("Utilities Loan" or "Loan") with the Association, by which Cooper Land issued a revolving credit line, free of interest, for the purpose of "funding the construction and installation of the water, wastewater, and electric utilities to serve [GSV]." The Loan document stated that the Association had the responsibility for funding the construction and installation of those utilities. The Loan, in an amount of up to $8 million, required the Association to make and deliver to Cooper Land a "Revolving Note" for the funds. The Loan initially provided that the Association "shall provide Cooper [Land] with written notice of its need for any funds under the [Loan]." Over time, Cooper Land and the Association executed two amendments to the Loan (and accompanying notes), which extended the due dates, increased the draw periods, and ultimately increased the amount to be borrowed to $15 million.[7]

---

[6] Neither the parties nor the record indicates the exact date of this change.

[7] The first amendment was on March 1, 2008, and increased the note to $15 million, with the principal payment due on June 30, 2009. The second amendment, made on July 1, 2009, extended the due date to June 30, 2011.

8

As part of the transaction between Cooper Land and Justice Holdings, on October 20, 2010, Cooper Land assigned its interest in the Loan Agreement to Justice Holdings. Between June 30, 2011, and June 30, 2013, the Association, controlled by the Justice Board, and Justice Holdings entered into the third, fourth, and fifth amendments to the Utilities Loan, which kept the draw at $15 million and extended the due date until 2012, 2013, and 2018, respectively. On June 28, 2018, the sixth amendment extended the Loan for six months, but the terms varied: The Association (1) agreed to a negative pledge, where it would continue to own its assets and not create any liens or security interests or encumbrances;[8] and (2) agreed to pay interest, with the Loan to be paid in full on or by December 31, 2018. The seventh amendment, entered into on November 18, 2018, extended the maturity date until June 30, 2019.

### E. The Litigation

After the Elected Board took over administration of the GSV Association in May 2019, the relationship between the Board and Justice Holdings quickly soured. On November 6, 2019, Justice Holdings sued the Association for nonpayment on the Utilities Loan amounting to $11.4 million. It asserted that the Association failed to pay the balance

---

[8] A different sixth amendment appears in the record, where the Association agreed to pledge all of its real property as security. It appears to be supplanted by the sixth amendment discussed above.

9

due on the Loan on June 30, 2019, or fifteen days thereafter. In its two-count complaint, Justice Holdings claimed breach of contract, based on the Utilities Loan, and entitlement to specific performance. Following the initiation of the lawsuit, the Association sent Justice Holdings a letter, asserting that it terminated the Loan pursuant to West Virginia Code § 36B-3-105, the Uniform Act provision addressing the termination of contracts when an elected board assumes control of the Association after a declarant-controlled board.[9] The Association also filed counterclaims, including claims: (1) seeking a declaration that the Utilities Loan had been terminated and was unenforceable; (2) asserting it was entitled to assessments that Justice Holdings had failed to pay or that had been improperly offset against the Loan Agreement; (3) seeking a declaration that the Exemption Provisions in the Declaration were invalid and should be severed and that Justice Holdings owed assessments on the Inventory Lots; (4) asserting that Justice Holdings breached the Declaration by failing to pay assessments; and (5) alleging that Justice Holdings was unjustly enriched.

On April 27, 2020, the Association filed a motion for summary judgment on Count VII of its counterclaim, seeking a declaratory judgment that the Declaration's Exemption Provisions violated the Uniform Act and that those provisions be severed from the Declaration. On October 5, 2020, the circuit court granted the Association's motion,

---

[9] This provision is discussed at length in the Discussion section below.

finding that: (1) Justice Holdings was the developer and declarant[10] of GSV as the successor to Cooper Land; (2) that GSV was "subject to the whole of the [Uniform Act] and all of its provisions;" and (3) that, as of July 1, 2018, Justice Holdings held 334 unsold Inventory Lots and that it never paid assessments on those lots based on the Declaration's Exemption Provisions. The court concluded that that the Exemption Provisions "directly violate[]" certain provisions of the Uniform Act, including that common expense allocations may not discriminate in favor of declarant-owned lots,[11] as those provisions' "purpose is to prevent developer-declarant's abuse of consumers and unit owners." The court severed the Exemption Provisions from the GSV Declaration "for all purposes as if the GSV Declaration did not contain the same from the dates of its execution, May 25, 2001, and its recordation . . . [on] May 30, 2001."[12] The court noted that, but for the Exemption Provisions, the lots at issue "would be subject to assessment."

---

[10] The Uniform Act defines "declarant" as "any person or group of persons acting in concert who: (i) As part of a common promotional plan, offers to dispose of his or its interest in a unit not previously disposed of; or (ii) reserves or succeeds to any special declarant right." W. Va. Code § 36B-1-103(12).

[11] *See* W. Va. Code § 36B-2-107(b).

[12] The circuit court set forth the provisions it severed from the Declaration as follows:

From Section 6, Article 10:

provided, however that no Assessments shall be applicable to or payable with respect to any Lot, Living Unit or Certificate Membership until the first day of the second month following execution of a contract of sale by the Development with respect to such Lot, Living Unit or Certificate Membership and further provided, no Assessment shall commence upon a Lot, Living

11

The Association also filed a motion for summary judgment on Count III of its counterclaim, asking the circuit court to declare the Utilities Loan, as amended, and the accompanying Note, "terminated and unenforceable," pursuant to West Virginia Code § 36B-3-105. On October 6, 2020, the circuit court granted the Association's motion for summary judgment by declaring that the Association was entitled to exercise its right to terminate the Utilities Loan, as amended, pursuant to West Virginia Code § 36B-3-105. The circuit court calculated the ninety-day period from the date of the letter pursuant to West Virginia Code § 36B-3-105 and found that the Association terminated the Loan on February 16, 2020. In response to Justice Holdings's assertion of laches, waiver and

    Unit or Certificate Membership where such contract of purchase is terminated by reason of a failure of down payment or rescission thereof pursuant to any right granted by any public and/or governmental authority or agency . . .;

(Alteration in original).

    From Section 9(f), Article 10:

    The following property subject to the Declaration shall be exempt from the Assessments created herein: any Lot or Living Unit owned or held by the Developer prior to the initial sale or contract to sell by the Developer and excluding and exempting any such Lot or Living Unit sold or contracted to be sold by the Developer which does not remain effective by reason or failure of down payment or recission pursuant to any right granted or created by any public and/or governmental agency or authority . . .;

(Alteration in original).

12

estoppel as defenses to the Association's right to terminate the Loan, the circuit court determined that equitable doctrines did not negate the application of the Uniform Act's termination provision. It further held that the Loan and related note, "were unenforceable and of no further effect, and all remedies that might have been available to Justice Holdings under them or arising out of them, were terminated and were no longer effective as of February 16, 2020." Also in this order, the court recognized that GSV constituted a common interest community under the Uniform Act. The court rejected Justice Holdings's argument that GSV was a limited expense liability planned community under § 36B-1-203(2), which would cause it to be subject to only a few provisions of the Act.[13]

On August 21, 2020, Justice Holdings filed a motion to amend its complaint. While the circuit court initially denied Justice Holdings's first attempt to amend its complaint, after the court's summary judgment rulings and declaration that the Uniform

---

[13] Relatedly on August 11, 2020, the Association filed a motion for summary judgment asking the circuit court to declare that GSV is a common interest community subject to the Uniform Act rather than a limited expense liability planned community exempt from the majority of the provisions of the Uniform Act. The next day, the Association filed a motion for summary judgment asking the court to declare that Justice Holdings is the declarant of GSV pursuant to the Uniform Act. The Association asserted that Justice Holdings denied being the declarant despite claiming, possessing, and exercising property rights that could only belong to a declarant under West Virginia Code § 36B-1-103(12). Justice Holdings conceded that if the Uniform Act applied, then Justice Holdings was the declarant during the time period at issue. By order entered on October 23, 2020, the circuit court granted both motions: the court determined that GSV was a common interest community subject to the Uniform Act for the reasons set forth in its October 6, 2020 order, and that Justice Holdings was the declarant of GSV.

13

Act applied to GSV, the court permitted Justice Holdings to file a First Amended Complaint by order on December 17, 2020. The circuit court's order stated simply that the court had considered the motion and found "that good cause has been shown to grant the Motion."

Justice Holdings recast its claims in the First Amended Complaint, emphasizing the GSV Declaration in light of the court's rulings on the termination of the Utilities Loan. Instead of alleging breach of contract relating directly to the Utilities Loan, the First Amended Complaint alleged that the Declaration provided an obligation for the Association to pay for the cost of construction, installation, and maintenance of many utility systems at GSV and asserted that Cooper Land "would not have funded the construction . . . nor undertaken the development" of GSV without the Association's obligation to provide the utilities systems. It alleged that Cooper Land and Justice Holdings had advanced and paid more than $12 million for these systems.

The Association filed a motion to dismiss Justice Holdings' First Amended Complaint. The circuit court, by order entered July 19, 2021, granted both a motion to dismiss *and* summary judgment to the Association on Justice Holdings's Count I breach of contract claim. The court refused Count II of the First Amended Complaint seeking a declaratory judgment relating to the parties' rights under the Declaration and the entry of a final judgment against the Association for $12.4 million. The court also dismissed Counts

III (alleging unjust enrichment), Count IV (alleging recovery in quantum meruit related to the benefits the Association received from Cooper Land and Justice Holdings relating to utilities), Count V (alleging promissory estoppel based on purported promises made by the Association in the Declaration relating to utilities), and Count VI (seeking recovery in quasi-contract relating to utilities). In dismissing Counts III through VI, the circuit court reasoned that "[a] claim for an equity remedy may not be interposed to defeat the legal remedy provided by the Legislature for this function and purpose." The court further determined that Justice Holdings did not assert a factual claim that the Association "engaged in conduct that supports relief in equity."

Finally, the circuit court, by order on November 3, 2021, granted summary judgment to the Association in an omnibus assessments order, relating to the Association's counterclaims in Count V (that Justice Holdings had improperly offset assessments it owed to the Association against the Loan agreement and owed many unpaid assessments), Count VII (in relevant part, seeking a declaratory judgment that Justice Holdings was in arrears on its obligation to pay the assessments on Inventory Lots subject to the Exemption Provisions), Count VIII (that Justice Holdings's failure to pay assessments on lots it owned, both unsold Inventory Lots and other lots, breached the Declaration, and it owed funds for its failure to pay assessments), and Count IX (that Justice Holdings was unjustly enriched by receiving the benefits of the common elements of GSV as a lot owner, yet failed to pay assessments). The court determined that the assessments owed by Justice Holdings to the

15

Association were for two types of lots: (1) Inventory Lots, which fell under the Exemption Provisions of the Declaration that the court severed from the Declaration; and (2) "Justice Lots," i.e., lots owned by Justice Holdings other than the Inventory Lots, both within GSV as well as lots in other nearby developments, The Farms and Phase I, subject to the covenant in the Declaration to pay assessments.[14] The court explained that

> the monetary judgments for unpaid assessments against Justice Holdings ought to include an amount equal to the unpaid Annual Assessments on the [l]ots within [GSV], The Farms[,] and Phase I owned by and assessed in the name of Justice Holdings for each of [the Association's] fiscal years, beginning with [the Association's] fiscal year, 2010-2011 and ending with [the Association's] fiscal year, 2020-2021.

The court determined there was "no genuine issue of material fact concerning the creation, existence, and ownership of lots" within GSV, The Farms, and Phase I, "including the ownership by Justice Holdings for any given month or year beginning with October 2010 and ending with July 2021."[15]

---

[14] The court also found that the previous owner of the lots of The Farms and Phase I, Glade Springs Resort Limited Liability Company, subjected itself to annual assessments in exchange for using the common properties of GSV, then later conveyed those lots to Justice Holdings.

[15] When discussing the lots, the circuit court repeatedly referred to Exhibits A, B, C, D, E, and F prepared by the Association and attached to the Association's "Supplemental Disclosure in Response to Justice Holdings, LLC's May 6, 2021 Objections." While apparently filed on August 31, 2021, this Supplemental Disclosure and its attached exhibits do not appear to be a part of the record before this Court and are not listed on the extensive Table of Contents to the Appendix Record. In the order, the court cites to Exhibit D as a basis for "abundant documentary evidence that Justice Holdings was or is the record owner of numerous Lots within [GSV], The Farms and Phase I during the period of time in issue . . . ."

The circuit court discussed certain "offsets" against the Utilities Loan when addressing the Association's Count IX allegations (Justice Holdings's "failure to pay assessments to [the Association] and the resulting unjust enrichment"). First, the circuit court found that Justice Holdings, since July 2014, unilaterally withheld assessments that it knew were due and owing to the Association by applying them to the balance of the Utilities Loan. The court found these offset payments void and of no legal effect as the Loan was terminated.[16] The court did not calculate these amounts separately anywhere in its order, apparently including these amounts in its overall calculations.

Regarding a payment on the Utilities Loan by the Justice Board of the Association, the circuit court also found that "during the period of declarant control, the [Justice Board] wrongly made $545,000 in payments to the declarant under the terminated Loan Agreement in lieu of its obligations to pay assessments on the Justice Lots. The court ruled, "[b]y the same reasoning set forth above with regard to the assessment offsets under the Loan Agreement, these payments are void and of no legal effect." The court separately

---

[16] Regarding the termination of the Utilities Loan, the circuit court added:

> [The Association's] termination of the [Utilities Loan] was the exercise of a purely statutory power. Although the power to terminate the contract appears to be similar to the avoidance of a voidable contract, an understanding of the effect of termination is not assisted by the void/voidable analogy because the power to terminate is governed entirely by the statute.

17

ordered that the Association was entitled to $545,000, exclusive of interest and other charges.

Ultimately finding that "Justice Holdings did not submit countervailing evidence contesting [the Association's] calculation of unpaid assessments on the Justice Lots or the [Inventory] Lots," the circuit court combined the assessments for all lots, seemingly including any offsets to the Utilities Loan (but not the lump sum payment), apportioned into fiscal years, and concluded that the Association was entitled to all unpaid assessments, in the amount of $6,073,692.18, exclusive of interest and other charges. The circuit court also ordered that Justice Holdings owed unpaid assessments, exclusive of interest, in that amount. It separately granted summary judgment to the Association on the $545,000 loan payment amount.[17]

On December 3, 2021, the circuit court granted the parties' joint motion to enter final judgment under West Virginia Rule of Civil Procedure 54(b), finding that a "unitary appeal is in the best interests of the parties and the Court, is efficient, prevents piecemeal appeal and promotes judicial economy." Justice Holdings then appealed.

---

[17] The circuit court further determined that, pursuant to West Virginia Code § 36B-3-116 and the Declaration, the Association "has a statutory lien 'on a unit for any assessment levied against that unit or fines imposed against its unit owner from the time the assessment or fine becomes due'" for the fiscal years beginning in 2018, 2019, and 2020, and that the "statutory lien also includes 'fees, charges, late charges, fines, and interest.'"

18

## II.

## STANDARD OF REVIEW

The errors complained of by Justice Holdings include the circuit court's grants of summary judgments in favor of the Association and dismissal of Justice Holdings's claims.[18] A circuit court's entry of summary judgment is reviewed de novo, as is its entry of an order granting a motion to dismiss a complaint. *See* Syl. pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994); Syl. pt. 2, *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 461 S.E.2d 516 (1995).

Motions to dismiss under Rule 12(b)(6) "should be granted only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Newton v. Morgantown Mach. & Hydraulics of W. Va., Inc.*, 242 W. Va. 650, 653, 838 S.E.2d 734, 737 (2019) (quoting Syl. pt. 3, in part, *Chapman v. Kane Transfer Co., Inc.*, 160 W. Va. 530, 236 S.E.2d 207 (1977)).

In regard to summary judgment, "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry

---

[18] To the extent that Justice Holdings also complains that the circuit court initially failed to allow it to amend its complaint, we "typically afford lower courts broad discretion in ruling upon motions to amend." *Lloyd's, Inc. v. Lloyd*, 225 W. Va. 377, 382, 693 S.E.2d 451, 456 (2010) (per curiam).

19

concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Sur. Co. v. Fed. Ins. Co. of N.Y.*, 148 W. Va. 160, 133 S.E.2d 770 (1963). Furthermore,

> [s]ummary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

Syl. pt. 2, *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 459 S.E.2d 329 (1995).

## III.

## DISCUSSION

Justice Holdings enumerated many errors in its brief, which we condense into three main issues: (1) that the circuit court erred when it found that GSV was subject to the entire Uniform Act, because the circuit court did not reform the Declaration into a format that would meet the statutory requirements of a limited expense liability planned community ("LELPC"); (2) that the circuit court erred by allowing the Association to terminate the Utilities Loan without providing equitable relief to Justice Holdings; and (3) that the circuit court erred by ordering Justice Holdings to pay many years of assessments on Inventory Lots previously subject to the Exemption Provision, as well as on other properties held by Justice Holdings, and relatedly, by requiring Justice Holdings to repay funds paid by the Association on the Utilities Loan or offset by Justice Holdings on the Loan. We address each of these alleged errors in turn.

20

### A. Glade Springs Village Is a Common Interest Community Subject to the Entire Uniform Act

Because the circuit court's many orders rely on its conclusion that the Uniform Act applies, the threshold question before this Court is whether the circuit court erred when it determined that the entirety of the Uniform Act applied to GSV. Justice Holdings frames this argument by stating that the circuit court erred by failing to *reform* the Declaration to meet the intent of the original parties, claiming that such a reformation would exempt GSV from most of the Uniform Act's provisions.

As noted above, a "common interest community" is "real estate with respect to which a person, by virtue of his ownership of a unit, is obligated to pay for real estate taxes, insurance premiums, maintenance or improvement of other real estate described in a declaration[,]" W. Va. Code § 36B-1-103(7), created by recording a declaration. *See* § 36B-2-101(a). As the circuit court explained, the Uniform Act excepts certain types of common interest communities from the majority of its many provisions. *See, e.g.*, § 36B-1-203 (entitled "Applicability to new common interest communities—Exception for small and limited expense liability planned communities").[19] This limited expense liability planned community ("LELPC") exception applies if the community's declaration provides

---

[19] The other types of excepted communities include those created before the effective date of the legislation, small cooperatives restricted to nonresidential use, and cooperatives containing no more than twelve units and not subject to any development rights. W. Va. Code §§ 36B-1-201 to 36B-1-203.

that "the annual average common expense liability of all units restricted to residential purposes, exclusive of optional user fees and any insurance premiums paid by the association, may not exceed three hundred dollars as adjusted pursuant to section 1-114 [§ 36B-1-114] (adjustment of dollar amounts)." W. Va. Code § 36B-1-203(2).[20] Should a community's declaration meet this exception, then the LELPC is subject to only three sections of the Act, "unless the declaration provides that this entire [Uniform Act] is applicable."[21] *Id.*

First, Justice Holdings argues that the original developer, Cooper Land, and the parties—including the initial Association controlled by Cooper Land—never intended for GSV to be subject to the Uniform Act. Instead, Justice Holdings claims that the original parties intended to make GSV an LELPC. Justice Holdings does not assert any error in the circuit court's determination that the GSV Declaration, as written, is not an LELPC. Instead, Justice Holdings urges this Court to find that the lower court erred by not *reforming* the GSV Declaration to put GSV in compliance with the LELPC exception and the purported intent of the parties. Justice Holdings claims that such a reformation would

---

[20] *See* W. Va. Code § 36B-1-114 (explaining how the $300 amount listed in § 36B-1-203 may change according to changes in the Consumer Price Index).

[21] The three West Virginia Code sections that apply to LELPCs are: § 36B-1-105, regarding separate titles and taxation; § 36B-1-106, regarding the applicability of local ordinances, regulations, and building codes; and § 36B-1-107, regarding eminent domain. W. Va. Code § 36B-1-203(2).

remove GSV from many components of the Uniform Act, in accordance with West Virginia Code § 36B-1-203(2) and the original parties' intent.[22]

Urging reformation, Justice Holdings explains that for eighteen years, no parties asserted that the Uniform Act applied. It also relies on an affidavit from J. Neff Basore, Jr., a member of the Cooper Land Board of Directors, the Association's Board, and the Board of Directors of Cooper Land's parent company. His affidavit claimed, among other things, that the Association "could be exempt from virtually all of [the Uniform Act] if the annual member assessment was less than the statutory amount contained in [the Act]" and that the Association "had full knowledge that [Cooper Land] had drafted the Declaration to exempt the Developer and community from [the Uniform Act]." Mr. Basore also asserted that the Declaration "intentionally set the annual assessment under the [Uniform Act] exemption amount to exempt the community and the [Association] from [the Uniform Act]."

In further support of its reformation argument, Justice Holdings points to the initial rate of GSV's annual assessment, $630, the threshold associated with the limited annual average common expense liability in West Virginia Code § 36B-1-203(2), as

_____

[22] Here, there is no dispute that GSV met the definition of a common interest community, as it was created by declaration and required GSV lot owners to pay assessments "related to the use and enjoyment" of common properties and for certain improvements. GSV assessments also included funds for the payment of taxes and insurance on common properties.

23

adjusted for 2001 pursuant to § 36B-1-114. Still, Justice Holdings recognized the GSV

Declaration allows certain annual assessment *increases*, as the Declaration stated that

assessments:

> may be increased each year above . . . the previous year by majority vote of the Board of Directors of the Association and without a vote of the membership, provided, however that such increase shall not in any one year exceed the greater of five percent (5%) or the increase in the Consumer Price Index for the twelve (12) month period ending June 30 of the preceding year . . . .

Claiming that the circuit court erred by not addressing its reformation argument, Justice

Holdings argues that the court should have reformed the portion of the excerpted GSV

Declaration by changing the phrase "greater of" to "lesser of" "to conform to the parties'

intent."[23] Justice Holdings argues that such a reformation would align the Declaration with

the LELPC exception that prevents assessments from being raised higher than the amount

calculated pursuant to West Virginia Code § 36B-1-114.

We need not address any substantive legal issues regarding the parties' intent

and whether the circuit court should have reformed the Declaration by one word. Even if

---

[23] Justice Holdings, in its response to the Association's motion for summary judgment that GSV is subject to the Uniform Act, did not appear to cite any law regarding reformation and merely states that "Justice Holdings seeks an equitable reformation of the language in the declaration" changing "greater of" to "lesser of." However, we note that "the proof required to justify a court of equity to reform and correct [a deed or other written instrument] to conform to the true intention of the parties must be *strong, clear, unequivocal, preponderating and convincing*." *Edmiston v. Wilson*, 146 W. Va. 511, 526, 120 S.E.2d 491, 500 (1961) (emphasis added).

we directed the circuit court to adopt Justice Holdings's proposed reformation, this remedy does not create a declaration that meets the requirements for the LELPC exception in West Virginia Code § 36B-1-203(2). The Declaration still allows the Association, pursuant to a recommendation by the Board and a vote, to raise the annual assessment to *any* amount, rather than an amount limited to the calculation in West Virginia Code § 36B-1-114:

> From and after July 1 of the year this Declaration is executed, the Annual Assessment may be changed . . . *without limitation on the amount of such change*, on the recommendation of the Board of Directors of the Association and approved by a majority vote of each class of Members who are voting in person or by proxy at a meeting duly called for this purpose.

(Emphasis added). Justice Holdings's proposed reformation fails to address this provision, and the circuit court recognized this impediment in its October 6, 2020 order. Because even a reformed Declaration, changed as suggested by Justice Holdings, would have allowed an assessment in any amount after a vote by the Association's members, GSV cannot qualify as an LELPC pursuant to West Virginia Code § 36B-1-203(2), as it is not limiting expenses.[24] "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Martin v. Randolph Cty. Bd. of Educ.*, 195 W. Va.

---

[24] We need not address Justice Holdings's argument that the circuit court erred by determining that LELPC assessments cannot increase over time. Because the Declaration allows limitless assessments, GSV cannot qualify as an LELPC. Therefore, the circuit court's determination that LELPC assessments may not be increased over time is inconsequential to our conclusion. *See Subcarrier Commc'ns, Inc. v. Nield*, 218 W. Va. 292, 297, 624 S.E.2d 729, 734 (2005) ("We need not reach the issue raised by the defendants, however, as we find that summary judgment was proper on grounds other than those asserted by the circuit court.").

297, 312, 465 S.E.2d 399, 414 (1995) (alteration in original) (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54, 112 S. Ct. 1146, 1149, 117 L. Ed. 2d 391 (1992)). Because the language of the statute conclusively establishes that the LELPC exception does not apply to GSV, and because GSV is indisputably a common interest community pursuant to the statute, there is no genuine question of fact regarding the Uniform Act's application to GSV.[25] *See* Syl. pt. 3, *Aetna Cas. & Surety Co.*, 148 W. Va. 160, 133 S.E.2d 770 ("A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law."). Accordingly, we find no error in the circuit court's determination that the Uniform Act fully applies to GSV, as it is a common interest community.

---

[25] In its Reply Brief, Justice Holdings urges this court to rely on *Emerald Ridge Property Owners Ass'n v. Thornton*, 732 A.2d 804, 807 (Ct. App. 1999), which found that a development's restrictive covenants and the reciprocal easement document lacked certain elements that the statute mandated should be in a declaration, and thus the development was not a common interest community in Connecticut's version of the Uniform Act. We are not persuaded by this case, as our Legislature has stated that the Uniform Act "applies to all common interest communities" created within West Virginia after July 1, 1986, and GSV is a common interest community. *See* W. Va. Code § 36B-1-201.

26

***B. The Circuit Court Did Not Err by Declaring that the Association
Terminated the Utilities Loan Effective February 16, 2020***

Having determined that the Uniform Act applies to GSV, we turn to Justice

Holdings's contention that the circuit court erred when applying West Virginia Code

§ 36B-3-105 of the Uniform Act to the Association's termination of the Utilities Loan.

While a declarant may control the association for a period, the declarant may

voluntarily surrender its rights to appoint the board. *See* W. Va. Code § 36B-3-103(d).[26]

Then, unit owners elect the association's board. W. Va. Code § 36B-3-103(f). The

Legislature specifically provides that when unit owners elect the board then that board may

terminate "without penalty" certain contracts and leases entered into while the declarant

controlled the board. *See* W. Va. Code § 36B-3-105 (entitled "Termination of contracts and

leases of declarant"). West Virginia Code § 36B-3-105(ii) allows the elected board to

terminate any contract "between the association and a declarant or an affiliate of a

---

[26] The Uniform Act also contains triggering events leading to an elected board. Pursuant to the Uniform Act, declarant appointment of the board ends no later than the earlier of one of these events:

> (i) Sixty days after conveyance of seventy-five percent of the units that may be created to unit owners other than a declarant; (ii) two years after all declarants have ceased to offer units for sale in the ordinary course of business; or (iii) two years after any right to add new units was last exercised.

W. Va. Code § 36B-3-103(d).

declarant" "without penalty" with ninety days' notice to the party if the contract was entered into while the declarant controlled the board.[27] W. Va. Code § 36B-3-105.

With those statutes in mind, we turn to Justice Holdings's arguments regarding the circuit court's orders relating to the Utilities Loan. Justice Holdings asserts that the circuit court erred in its interpretation of termination because, under the Uniform Act, termination could only be prospective. It also argues that the court should have preserved Justice Holdings's rights based on breach of contract or performance, keeping the Association's repayment obligation prior to February 16, 2020 intact.

**1. The circuit court properly determined that the Association terminated the Utilities Loan.** To the extent that the circuit court granted summary judgment in favor of the Association and determined the Utilities Loan terminated on February 16, 2020, with no ability for Justice Holdings to recover funds purportedly owed under the Loan, we affirm the circuit court's determination. First, West Virginia Code § 36B-3-105(ii) applies;

---

[27] The relevant portion of W. Va. Code § 36B-3-105 reads as follows:

> If entered into before the executive board elected by the unit owners pursuant to section 3-103(f) [§36B-3-103] takes office, . . . (ii) any other contract or lease between the association and a declarant or an affiliate of a declarant . . . may be terminated without penalty by the association at any time after the executive board elected by the unit owners pursuant to section [§36B-]3-103(f) takes office upon not less than ninety days' notice to the other party.

28

the Elected Board exercised its right to terminate the Loan entered into by the Association during a period of declarant control. The termination provision in West Virginia Code § 36B-3-105 unambiguously states that the contract "may be terminated without penalty" by the Association. We must apply this unambiguous statutory language, and "[w]e look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't*, 195 W. Va. 573, 587, 466 S.E.2d 424, 438 (1995). The plain meaning of terminated means to end. Black's Law Dictionary defines terminate as "1. To put an end to; to bring to an end. 2. To end; to conclude." *Terminate*, Black's Law Dictionary (11th ed. 2019). To terminate without penalty, then, means to terminate without any further costs or loss to the Association. When a contract is terminated without penalty, the obligations that were based upon the existence of that contract necessarily end.

However, we agree with Justice Holdings's argument that termination by the association without penalty is *prospective*, insofar as termination ends the contract on a certain date. Earlier payments and actions taken in accordance with the contract, before its termination date, are not affected by an association's "termination without penalty" of the contract. *See, e.g.*, *Energy Ctr., LLC v. Falls & Pinnacle Owners' Ass'n*, No. A11-1023, 2012 WL 254500, at *3 (Minn. Ct. App. Jan. 30, 2012) (recognizing that Minnesota's similar termination statute protects associations "from being bound to contracts that they were not able to negotiate" and allowing an association to terminate a service agreement

29

for heating, cooling, and hot water services going forward). The termination provision is a statutory power. Thus, our general common law provisions regarding voidable and void contracts, while instructive, are not dispositive. *See, e.g.*, Syl. pt. 2, in part, *McGinnis v. Cayton*, 173 W. Va. 102, 312 S.E.2d 765 (1984) ("Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable . . . ."); *Ryder v. Ryder*, No. 18-0865, 2020 WL 1674226, at *5 (W. Va. Apr. 6, 2020) (memorandum decision) ("A 'void contract' is defined as '[a] contract that is of no legal effect, so that there is really no contract in existence at all. A contract may be void because it is technically defective, contrary to public policy, or illegal.'" (quoting Black's Law Dictionary (11th ed. 2019)). The Act's "termination without penalty" language does not provide that the contract is void from its inception, or voidable.

We reject Justice Holdings's arguments that we should use other applications of "termination" found in the West Virginia Code, including: (1) the definition that appears in the Uniform Commercial Code addressing rights after termination "based on prior breach or performance,"[28] *see* W. Va. Code § 46-2-106; and (2), in the Uniform Act, the provision pertaining to the preservation of creditors' rights at a termination of a common

---

[28] The Uniform Commercial Code states "'Termination' occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. On 'termination' all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives." W. Va. Code § 46-2-106(3). As explained, we do not adopt this definition in this context.

30

interest community. *See* W. Va. Code § 36B-2-118(h). In those statutes, the Legislature chose to carve out remedies for parties after termination. In West Virginia Code § 36B-3-105, the Legislature did not provide for any additional remedies for the declarant after termination in the Uniform Act language at issue here.

While we have found that the plain language of the statute applies and we need not construe the Uniform Act regarding the "termination without penalty" provision, policy considerations help inform the Uniform Act's directives and support our conclusion regarding the application of the termination provision. The Uniform Act, as well as the GSV Declaration, entertains a situation where a developer no longer controls and manages the common interest community. At the end of developer control of the association, West Virginia Code § 36B-3-105 protects lot owners' interests and keeps the developer from exercising undue control over the common interest community that it no longer controls. The Restatement (Third) of Property: Servitudes § 6.19 (Am. L. Inst. 2000), titled "Developer's Duty to Create an Association and Turn Over Control" contains similar language to the Uniform Act, noting that "[a]fter the developer has relinquished control of the association to the members, the association has the power to terminate without penalty . . . any contract or lease between the association and the developer."[29] In the comments, the Restatement explains the rationale behind why, initially, a developer would

---

[29] The Restatement (Third) of Property (Servitudes) § 6.19 "is largely patterned after provisions of the Uniform Common Interest Ownership Act." Restatement (Third) of Property: Servitudes § 6.19, reporter's note (Am. L. Inst. 2000).

31

first create and manage an association—to protect its interest—and then, over time, cede control to the lot owners when it no longer needs that protection. In comment D, the Restatement describes the purpose behind the ability of an association to terminate a contract between the association and the developer:

> The developer's duty to turn over control can be thwarted if the developer obligates the association to long-term arrangements that effectively deprive the owners of control of the common property. By the same token, the value of the members' investments can be significantly devalued by long-term leases or other arrangements that commit them to pay potentially exorbitant costs for services or facilities. While the association is under the developer's control, the members have little opportunity to protect themselves. Accordingly, modern statutes permit the association to terminate certain contracts that are likely to be critical to the members' enjoyment of their rights after the developer has relinquished control.

Restatement (Third) of Property: Servitudes § 6.19 cmt. d (Am. L. Inst. 2000). Furthermore, as the Association remarks in its brief, the National Conference of Commissioners on Uniform State Laws in 1982 explained that the termination section of the Uniform Act, which was ultimately adopted by the Legislature, "deals with a common problem in the development of condominium, planned community and cooperative projects: the temptation on the part of the developer, while in control of the association, to enter into, on behalf of the association, long-term contracts and leases with himself or with an affiliated entity." *Unif. Comm. Int. Ownership Act* (1982) § 3-105 cmt. 1, 7 U.L.A. 107 (2009). In other words, the Uniform Act's termination provision prevents developers from seeking to continue to control the development or to reap financial gains from the lot

owners after the developers no longer control the association. Our recognition of the plain language meaning of the statute aligns with these concerns.

Few courts have addressed a provision permitting an owners' association to terminate a contract without penalty in the context of an ongoing obligation, such as a loan from a developer to an association. The parties cite *Genoa Lakes Resort Homeowners Association v. Genoa Developer Associates*, No. 14-CV-0222, 2015 Nev. Dist. LEXIS 2869 (Nev. Ninth Jud. Dist. Ct. Dec. 1, 2015) ("*Genoa Lakes*"), which addressed a similar provision in Nevada's law. In *Genoa Lakes*, after a declarant built a fitness center and advertised it as part of the development, the declarant caused the association with a declarant-controlled board to execute a $1 million note with interest. *Id.* at *1-2, *6-7. When the association became controlled by the unit owners, it moved to terminate the note. *Id.* at *25. In deciding in favor of the association, the court considered that the unit owners did not vote or otherwise authorize the note, as required to encumber common elements of a development. *Id.* at *16-*18. The court also found that the Note and Deed of Trust were validly terminated. *Id.* at *29. The court reviewed the purpose of Nevada's provision allowing termination, comparing it to the Restatement (Third) of Property's similar provision that assists members who "have little opportunity to protect themselves while the association is under the control of the developer." *Id.* at *26 (quoting Restatement (Third) of Property: Servitudes § 6.19 cmt. d (Am. L. Inst. 2000)). Ultimately the court allowed the Association to end its obligation and keep the fitness center and rejected the declarant's

33

invitation to consider equitable arguments in light of the statutory language. *See id.* at *15, *29.

This analysis, while somewhat different than the facts before us, is instructive. And here, we are not facing a concrete building on a common area in GSV, but, instead, a Loan and related note. Like the court in *Genoa Lakes*, however, we find the language of the statute is plain, allows an association to terminate a contract between a declarant and itself, ends the association's liability under the contract, and is in accordance with the purpose of the statute.

After unit owners elect the board of an association, West Virginia Code § 36B-3-105(ii) allows a unit owner's association to terminate, without penalty, contracts and leases entered into with the declarant while the declarant controlled the association's board. As provided in West Virginia Code § 36B-3-105, the termination is effective not less than ninety days after the association provides notice to the declarant. In accordance with this provision, we now hold that, based on the plain language of the statute, when an association terminates a contract "without penalty" under West Virginia Code § 36B-3-105, that termination ends the parties' rights and responsibilities at the time of the termination.

As mentioned, the circumstances of the termination of the Loan involves no dispute of material facts: The Association entered into the Loan with a declarant-controlled board and terminated the Loan when the Elected Board took control. The circuit court granted summary judgment to the Association on this issue. "Summary judgment . . . is a device designed to effect a prompt disposition of controversies on their merits without resort to a lengthy trial, if in essence there is no real dispute as to salient facts or if only a question of law is involved." *Hanks v. Beckley Newspapers Corp.*, 153 W. Va. 834, 836-37, 172 S.E.2d 816, 817 (1970). As there are no disputed facts, the circuit court did not err when it granted summary judgment on the Association's declaratory judgment action and precluded recovery by Justice Holdings on the Association's terminated Loan with Justice Holdings.

We further hold, in accordance with the plain statutory language, that termination pursuant to West Virginia Code § 36B-3-105(ii) is prospective, such that amounts previously and properly paid by an association under the contract cannot be recouped by the association. The plain language of the statutory termination provision dictates that the contract ends, at the option of the association, without penalty to the association. To the extent that the circuit court, in its later assessments order, determined that the effect of the termination of the Loan was to erase its creation and the legal effect was to reverse prior payments under the Loan, we find that the court erred. The impact of this finding on the circuit court's assessment order is discussed more thoroughly below.

35

**2. The court did not err when it dismissed Justice Holdings's claims related to the amounts previously owed under the Utilities Loan.** [30] As a related matter, Justice Holdings further requests that this Court find error in the circuit court's determination "that Justice Holdings had not stated colorable equitable claims in the Amended Complaint or First Amended Complaint." When the circuit court granted the Association's Motion to Dismiss Justice Holdings's claims relating to unjust enrichment, in quantum meruit, promissory estoppel, and quasi-contract, it determined that, while the claims named the Declaration, equitable principles were not applicable in Justice Holdings's "attempt to recoup amounts purportedly advanced for utility infrastructure at

---

[30] Justice Holdings also assigns error to the circuit court's dismissal of Count I of its First Amended Complaint, breach of contract based on the GSV Declaration. In its July 19, 2021 order, the circuit court granted the Association's Rule 12(b)(6) motion to dismiss, finding that the language relied on in the Declaration was not a contract. The circuit court also granted summary judgment in favor of the Association for Count I, finding that the Association terminated any contracts in the Declaration via a notice on October 16, 2020, in accordance with West Virginia Code § 36B-3-105.

While Justice Holdings provided a short argument relating to the court's *dismissal* of Count I, Justice Holdings failed to address the court's grant of summary judgment on Count I, mentioning the circuit court's holding only in passing in its Reply Brief. This grant of summary judgment will stand without this Court determining whether the Rule 12(b)(6) dismissal was appropriate. Addressing Justice Holdings's assignment of error regarding the dismissal of Count I would result in an improper advisory opinion, as Justice Holdings did not argue or raise on appeal the grant of summary judgment on the same count. "Courts are not constituted for the purpose of making advisory decrees or resolving academic disputes." *Mainella v. Bd. of Trs. of Policemen's Pension or Relief Fund*, 126 W. Va. 183, 185, 27 S.E.2d 486, 487-88 (1943). *See also Tiernan v. Charleston Area Med. Ctr., Inc.*, 203 W. Va. 135, 140 n.10, 506 S.E.2d 578, 583 n.10 (1998) ("Issues not raised on appeal or merely mentioned in passing are deemed waived.").

[GSV]." The court did not err when dismissing these claims, as no set of facts would have entitled Justice Holdings to relief. *See, e.g.*, *Newton*, 242 W. Va. 650, 838 S.E.2d 737.[31]

Focusing its argument on these claims' relationship to the terminated Utilities Loan, Justice Holdings asserts that allowing the Association "to retain the principal benefit . . . results in gross injustice and demands relief in equity." While those dismissed claims in the First Amended Complaint purport to pertain to the Declaration, Justice Holdings's brief emphasizes the relationship between these claims and the unpaid Utilities Loan. The Uniform Act provides that "the principles of law and equity," such as estoppel, "*supplement*" the Act's provisions, "except to the extent *inconsistent* with this chapter."[32] W. Va. Code § 36B-1-108 (emphasis added). We agree with the circuit court,

---

[31] To the extent that Justice Holdings argues that the circuit court erred by "striking 'contractual provisions' from the Declaration," and claims that the Association terminated "select provisions" of the Declaration, this limited argument is mentioned only in passing and Justice Holdings does not cite to the record relating to these arguments. As these issues are not fully briefed, we deem these errors abandoned. *State v. Lilly*, 194 W. Va. 595, 605 n.16, 461 S.E.2d 101, 111 n.16 (1995) (noting that "casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal" (quoting *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993)).

[32] West Virginia Code § 36B-1-108 provides:

> The principles of law and equity, including the law of corporations and unincorporated associations, the law of real property, and the law relative to capacity to contract, principal and agent, eminent domain, estoppel, fraud, misrepresentation, duress, coercion, mistake, receivership, substantial performance, or other validating or invalidating cause supplement the provisions of this chapter, except to the extent inconsistent with this chapter.

37

as it explained in its October 23, 2020 order denying Justice Holdings's initial motion to amend its complaint, that the remedies employed by Justice Holdings, such as promissory estoppel and unjust enrichment, which would allow Justice Holdings to recover based upon the termination of the Loan, would be *inconsistent* with West Virginia Code § 36B-3-105 allowing the loan's termination.[33] *See* W. Va. Code § 36B-1-108. The circuit court reiterated its finding that those remedies would be inconsistent in its July 19, 2021 order dismissing Justice Holdings's claims to recover based on the Association's purported "retention of benefits of the Utilities Loan."[34] As West Virginia Code § 36B-3-105 provides, the Association may terminate a contract between the Association and Justice Holdings "without penalty" under the circumstances present here. Furthermore, because a declarant may not "act under a power of attorney, or use any other device, to evade the limitations or prohibitions of [Chapter 36B of the West Virginia Code] or the declaration," Justice Holdings cannot rely on its additional claims based on the Declaration to escape the Act's plain language allowing the Association to terminate the Utilities Loan. *See* W. Va. Code § 36B-1-104.

---

[33] While the circuit court refers to Justice Holdings's claims as equitable claims, we need not address the intricacies of whether its claims are claims in equity or claims in law, as the result is the same. West Virginia Code § 36B-1-108 does not distinguish between law and equity when determining that those principles *supplement* the Uniform Act but are not applicable if they are *inconsistent* with the Act.

[34] Count III of the Justice Holdings's First Amended Complaint asserts a claim for unjust enrichment, based on the Association's retention of the benefits of the Utilities Loan.

Justice Holdings contends that the Uniform Act's directive in West Virginia Code § 36B-1-113(a), that "[t]he remedies provided by this chapter shall be liberally administered to the end that the aggrieved party is put in as good a position as if the other party had fully performed," requires it to receive relief from the termination of the Utilities Loan. It claims that the circuit court erred by "refusing to acknowledge that Justice Holdings was the 'aggrieved party' in this case." While Justice Holdings fails to direct this Court to the point in the record where it brought this issue before the lower court, the *remedy* provided by the Uniform Act relating to the Utilities Loan is the Loan's *termination*, and "liberally administer[ing]" such *remedy* allows an association, with an elected board, to walk away from a contract with a declarant, entered into when the declarant appointed the board. *See* W. Va. Code §§ 36B-1-113(a); 36B-3-105.[35]

Ultimately, the circuit court did not err when it dismissed Justice Holdings's claims arising from the Utilities Loan, because the plain language of West Virginia Code

---

[35] Justice Holdings also contends that delay in bringing these claims or asserting rights under the Uniform Act by the Association and the lot owners should preclude the Association's claims, as the Association failed to address any issues relating to the Uniform Act before this litigation. Still, Justice Holdings controlled the Association until shortly before the Association terminated the Loan. The Justice Board's apparent lack of payments, so the Loan remained in place, is the type of control over an association that West Virginia Code § 36B-3-105 seeks to prevent—where developer retains control over a common interest community and its association, even after it has ceded control of the board. *See* Restatement (Third) of Property: Servitudes § 6.19, cmt. d (Am. L. Inst. 2000).

§ 36B-1-108 precludes the use of the "principles of law and equity" when they are inconsistent with the Act, and no set of facts in support of its claims would entitle Justice Holdings to relief. *See, e.g.*, *Newton*, 242 W. Va. 650, 838 S.E.2d 737.

In conclusion, West Virginia Code § 36B-3-105 permitted the Association to terminate the Utilities Loan because the parties entered into the Loan when the declarant controlled the board, which was first Cooper Land, then Justice Holdings, and the Association terminated the Loan after the Elected Board took control. According to the plain language of West Virginia Code § 36B-3-105, this termination eliminated the parties' responsibilities and liability under the Loan prospectively, but did not invalidate prior payments of amounts by the Association, if those payments were properly made in accordance with the Loan.[36] We discuss the circuit court's order relating to the $545,000 paid by the Association on the Loan, as well as Justice Holdings's offsets regarding the Utilities Loan, below.

---

[36] In Justice Holdings's Reply Brief arguing that the Uniform Act should not apply to GSV and that this Court should protect its interest in the Utilities Loan, it states that "enforcement of the rule of law matters." Certainly, the plain language of the statute requires this Court to find that the Uniform Act applies to GSV and that the Loan is terminated without penalty. While Justice Holdings argues that enforcement of the Uniform Act will chill development in West Virginia, or prevent developers from risking capital, these are not matters within the purview of this Court. *See* Syl. pt 1, in part, *State ex rel. Appalachian Power Co. v. Gainer*, 149 W. Va. 740, 143 S.E.2d 351 (1965) ("Courts are not concerned with questions relating to legislative policy. The general powers of the [L]egislature, within constitutional limits, are almost plenary.").

*C. Assessments and Reversal of Payments on and Credits to Utilities Loan*

We finally turn to Justice Holdings's argument that the circuit court erred by granting summary judgment to the Association relating to its assessments order. Justice Holdings argues that: (1) the circuit court erred by invalidating the $545,000 in Utilities Loan payments by the Association to Justice Holdings, as the Loan termination was prospective under West Virginia Code § 36B-3-105; (2) the circuit court erred by voiding over $400,000 in assessments Justice Holdings paid in the form of credits against the Utilities Loan balance; and (3) the circuit court erred by retroactively assessing lots held by Justice Holdings in GSV, including by assessing developer lots in GSV, Phase I, and the Farms. Related to the retroactive assessments, Justice Holdings also contends that the circuit court erred by determining that the Exemption Provisions violate the Uniform Act and subsequently severing them from the Declaration.

The assessment order appears comprehensive, yet we find, as described below, "that the court made insufficient findings of fact and conclusions of law for us to conduct an adequate appellate review as to the underlying merits of its grant of summary judgment." *State Farm Fire & Cas. Co. v. Nathaniel Realty, LLC*, 246 W. Va. 676, 680, 874 S.E.2d 788, 792 (2022). Furthermore, as we have done in other cases, "we do find the record and associated arguments sufficiently developed" to address *certain* issues raised

before us, therefore resolving those "before remanding for further development and[] proceedings" that may be necessary. *Id.*

**1. Loan Payments.** We first address Justice Holdings's argument that the circuit court erred by requiring Justice Holdings to, essentially, return a $545,000 Utilities Loan payment made by the Association. Justice Holdings argues that any termination under the Loan must be prospective. The circuit court determined, as mentioned above, that the Justice Board "wrongly made $545,000 in payments" to Justice Holdings under the terminated Loan Agreement instead of paying assessments to the Association on the Justice Lots—lots owned by Justice Holdings, yet not Inventory Lots. The circuit court appears to have based its determination that Justice Holdings must return the $545,000 in part on the Loan termination. However, the order, without explaining its reasoning, conflates the termination of the Loan with Justice Holdings purportedly offsetting the assessments owed by Justice Holdings to the Association. Consequently, the circuit court makes no determination regarding how or when the Association authorized a $545,000 payment to Justice Holdings on the Loan, or what effect the $545,000 payment had on the Association's prior Loan obligations or Justice Holdings's assessments due to the Association.

As we determined in Section B, *supra*, the termination of the Loan ended the parties' rights and responsibilities *at the time of the termination*. A termination made

pursuant to West Virginia Code § 36B-3-105 does not erase the Loan's prior existence, only the continuing obligation underlying the Loan. Here, while unclear, the circuit court seems to treat the contract as void. *See Ryder*, 2020 WL 1674226, at *5. While a declarant lacks recourse for liabilities eliminated by the termination of the contract pursuant to West Virginia Code § 36B-3-105, earlier payments and actions taken in accordance with the contract are not affected by the termination without penalty. A termination of the Utilities Loan in accordance with § 36B-3-105 would not reverse payments on the Utilities Loan occurring *before* the Loan's termination, if authorized by the Board in accordance with its statutory powers. While it controlled the Association, the Justice Board had the independent legal authority to manage the affairs of the Association. *See* W. Va. Code § 36B-3-102(5) (providing that associations may "[m]ake contracts and incur liabilities"); § 36B-3-103(a) (providing that, with certain exceptions and in accordance with the bylaws and declaration, "the executive board may act in all instances on behalf of the association").[37]

Having clarified that the termination of the Loan pursuant to § 36B-3-105 has no impact on Loan payments made prior to termination, we cannot, without further findings of fact regarding the circumstances of the Justice Board's Loan payment decision or any potential offsets of assessments related to the Loan payment, affirm the circuit

---

[37] This opinion need not, and does not, address or make any determinations as to whether the Board's actions were in accordance with any fiduciary duty its members may have.

court's determination regarding the $545,000 payment. Therefore, we reverse and remand the Court's grant of summary judgment regarding the $545,000 payment for further development of the record regarding this payment.

**2. Justice Holdings's Unilateral Offsets Against the Loan.** Justice Holdings also asserts that the circuit court erred by voiding $400,000 in assessments that Justice Holdings paid in the form of credits against the Utilities Loan balance. The Association's Count V alleged, among other things, that "Justice Holdings improperly offset more than $400,000 in assessments . . . against the [Utilities Loan] through April of 2019" for assessments due on lots held by Justice Holdings. The parties appear to agree that Justice Holdings offset the assessments, as Justice Holdings claims in its brief that it "posted credits of over $400,000 to the Utilities Loan prior to the effective date of its termination, representing assessments owed to the [Association] on 63 Justice Lots." The circuit court granted summary judgment on Count V to the Association, a broad claim regarding many unpaid assessments on non-Inventory Lots.

The factual circumstances and applicable law related to these offsets, however, were not fully developed by the circuit court or the parties below to an extent that this Court can determine whether summary judgment was appropriate. The circuit court, with no citation to authority or legal analysis, stated that Justice Holdings's "unilateral withholding of assessment payments" is "anticipatory self-help as to a contract claim"

before it has been reduced to judgment. However, the order fails to explain why the offsets are improper as a matter of law other than its conclusory statement regarding the unilateral withholding. The court also appears to rely on its interpretation of "termination without penalty" as part of its basis to find the offsets void and of no legal effect. The circuit court's order does not set forth the specific amounts withheld by Justice Holdings, to which assessments the withholdings applied, the timing of the self-help (other than it occurred during 2014 and after), whether the parties modified any agreement regarding assessments, or whether the Board, pursuant to any authority, accepted a different form of payment via the offsets. "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Surety Co.*, 148 W. Va. 160, 133 S.E.2d 770. We cannot, with the record before us, determine whether summary judgment was appropriate as it relates to these offsets, or the amount of the offsets, or even the law the circuit court relied on to invalidate these offsets. Therefore, we also reverse and remand the court's grant of summary judgment regarding offset payments for additional proceedings.

**3. Assessments from 2010 until 2021.** Finally, we address Justice Holdings's assignment of error regarding the circuit court's assessments judgment in its November 3, 2021 order, to the extent we did not address it previously. The assessments order granted summary judgment in favor of the Association on Counts V, VII, VIII and

IX and included a monetary judgment for numerous assessments allegedly unpaid by Justice Holdings. This monetary judgment calculated assessments on Inventory Lots, GSV lots held by Justice Holdings that were not Inventory Lots, and Justice Holdings-owned lots in Phase I and The Farms subject to assessment by the Association. The circuit court calculated the assessments via fiscal year, but lumped all the assessments, per year, together. The order relied in part on the circuit court's previous October 5, 2020 order granting summary judgment to the Association on Count VII, which sought a declaratory judgment that the Exemption Provisions, precluding assessments on unsold Inventory Lots, violated the Uniform Act. We address that first.

*a. Exemption Provisions.* The Uniform Act sets forth many requirements for a common interest community's declaration that the GSV Declaration lacks or directly contravenes. *See* W. Va. Code § 36B-2-105 (regarding required contents of a declaration). As a threshold issue, we first affirm the circuit court's summary judgment order of October 5, 2020, determining that: (1) the Exemption Provisions allowing the developer to avoid paying assessments on unsold GSV lots violated the Uniform Act; and (2) those Provisions can be severed from the Declaration. The Uniform Act provides requirements on how assessments must be managed. Assessments by the association must be made at least annually "based on a budget adopted at least annually by the association." W. Va. Code § 36B-3-115(a). Except in certain limited situations, common expenses "must be assessed against *all* the units in accordance with the allocations set forth in the declaration." W. Va.

46

Code § 36B-3-115(b) (emphasis added). The declaration "must allocate to each unit . . . in a planned community, a fraction or percentage of the common expenses of the association . . . and a portion of the votes of the association." W. Va. Code § 36B-2-107(a)(iii). While "[t]he declaration must state the formulas used to establish allocations of interests," the allocations "*may not discriminate* in favor of units owned by the declarant or an affiliate of the declarant." W. Va. Code § 36B-2-107(b) (emphasis added).[38]

The GSV Declaration, while it included no allocation process as required by the Uniform Act, discriminated in favor of Inventory Lots, as it specifically provided that "no Assessments shall be applicable to or payable with respect to any Lot . . . until the first day of the second month following execution of a contract of sale by the Developer with respect to such Lot," while other lot owners were required to pay assessments, and that the Inventory Lots were "exempt from the Assessments created" in the Declaration.[39] Because the GSV Declaration violated the Uniform Act by exempting Inventory Lots from assessment, in contravention of the Uniform Act's prohibition against discrimination in

---

[38] While the circuit court recognizes that the Declaration includes no formula, it also recognizes that the Association currently allocates assessments via a formula.

[39] *See supra* n. 12 detailing the Exemption Provisions.

favor of developer-held lots, we affirm the circuit court's determination that the Exemption Provisions violated the Uniform Act.

We are not persuaded by Justice Holdings's arguments relying on West Virginia Code § 36B-2-105(a)(8) and § 36B-1-103(14) for the proposition that "there is nothing unfair or improper" about the developer's exemption from assessment. Section 36B-2-105(a)(8) allows a declaration to include a description of any development rights and other special declarant rights "reserved by the declarant, together with a legally sufficient description of the real estate to which each of those rights applies, and a time limit within which each of these rights must be exercised." Section 36B-1-103(14), in turn, defines "development rights" as

> any right or combination of rights reserved by a declarant in the declaration to: (i) Add real estate to a common interest community; (ii) create units, common elements or limited common elements within a common interest community; (iii) subdivide units or convert units into common elements; or (iv) withdraw real estate from a common interest community.

Nothing in these provisions allows a developer to avoid the assessments imposed on *all* units in the declaration pursuant to West Virginia Code § 36B-3-115(b), or the requirement that allocations "may not discriminate in favor of units owned by the declarant or an affiliate of the declarant." W. Va. Code § 36B-2-107(b).

We next affirm the circuit court's determination that it could sever the offending Exemption Provisions from the GSV Declaration, excising the terms in the

48

Declaration allowing Inventory Lots to avoid assessment. The parties cannot contract around the terms of the Uniform Act and may not waive rights conferred by the Act. *See* W. Va. Code § 36B-1-104. Unless expressly provided by the Uniform Act, the Act's provisions "may not be varied by agreement, and rights conferred may not be waived." *Id.* Furthermore, "[a] declarant may not act under a power of attorney, or use any other device, to evade the limitations or prohibitions of [Chapter 36B of the West Virginia Code] or the declaration." *Id.* Moreover, both the GSV Declaration and the Uniform Act provided for such a severance. Article XVII, § 2 of the GSV Declaration provided that

> If any of the provisions of this Declaration . . . or any section, clause, phrase, word, or the application thereof, in any circumstance, is held or determined to be invalid, the validity of the remainder of such instruments and the application of any such provision, action, sentence, clause, phrase or word, in other circumstances, shall not be affected thereby and shall remain in full force and effect.

Similarly, the Uniform Act states that "[a]ll provisions of the declaration and bylaws are severable." W. Va. Code § 36B-2-103(a). For these reasons, the circuit court did not err by severing the Exemption Provisions from the Declaration, making them unenforceable.

**b. *Back Assessments.*** While we have affirmed the circuit court's determination that the Uniform Act applies to GSV and that the Exemption Provisions were rightfully severed from the Declaration, still, the circuit court's order regarding the payments of assessments lacks careful—or any—consideration of important, related provisions in the Uniform Act. Certainly, the order methodically details the lots that were—

49

or should have been, had the Declaration not exempted the Inventory Lots—subject to assessment. It analyzes the Inventory Lots, Justice Holdings's non-Inventory Lots in GSV, and the Farms and Phase I lots owned by Justice Holdings, finding that those lot owners agreed to make themselves Class A Association members in exchange for annual assessment payments. The order additionally determines certain Uniform Act provisions apply, noting remedies available to the Association, including liens and attorney's fees, pursuant to West Virginia Code § 36B-3-116.

Still, in the considerable, sweeping order reaching back to 2010 for assessments, and awarding "interest on the unpaid assessments at the rate of 10 percent a year accruing from the date of delinquency for each applicable assessment period" (to be determined in another order), the order nevertheless includes no indication, nor contemplates, whether that the Justice Board requested such assessments at any time.[40] From the assessments order, we cannot determine whether the circuit court considered pertinent provisions in the Uniform Act potentially applicable to its legal conclusions and judgment calculations, including the requirement that a budget to be ratified by unit owners, *see* W. Va. Code § 36B-3-103(c), and that expenses must be assessed against *all* units in accordance with allocations set forth in the declaration, *see* W. Va. Code §§ 36B-2-107; 36B-3-115(b). Similarly, we cannot determine whether the circuit court considered

---

[40] In its order on October 5, 2020, addressing the Exemption Provisions, the court noted that the Inventory Lots were not historically assessed by the Association.

the Uniform Act requirement that, unless otherwise provided in the declaration, surplus funds of the association "must be paid to the unit owners in proportion to their common expense liabilities or credited to them to reduce their future common expense assessments."[41] W. Va. Code § 36B-3-114. The circuit court made no findings of fact or conclusions of law relating to any of these additional provisions in the Uniform Act. We have determined that

> [a]lthough our standard of review for summary judgment remains de novo, a circuit court's order granting summary judgment must set out factual findings sufficient to permit meaningful appellate review. Findings of fact, by necessity, include those facts which the circuit court finds relevant, determinative of the issues and undisputed.

Syl. Pt. 3, *Fayette Cnty. Nat'l Bank v. Lilly*, 199 W. Va. 349, 484 S.E.2d 232 (1997), *overruled on other grounds by Sostaric v. Marshall*, 234 W. Va. 449, 766 S.E.2d 396 (2014). Because the entirety of the Uniform Act applies to GSV, any grant of summary judgment on assessments must address the *impact* of the Uniform Act's budgeting and surplus fund provisions, as well as the legal impact or effect of any acquiescence of the Justice Board in Justice Holdings's failure to pay these assessments. Here, the assessment

---

[41] In full, West Virginia Code § 36B-3-114 provides

> Unless otherwise provided in the declaration, any surplus funds of the association remaining after payment of or provision for common expenses and any prepayment of reserves must be paid to the unit owners in proportion to their common expense liabilities or credited to them to reduce their future common expense assessments.

51

order makes "insufficient findings of fact and conclusions of law" to allow us to adequately review the underlying merits of its grant of summary judgment related to these assessments. *See State Farm Fire & Cas. Co.*, 246 W. Va. at 680, 874 S.E.2d at 792.

For these reasons, we vacate and remand the circuit court's assessment order for further proceedings.

## IV.

## CONCLUSION

Based on the foregoing analysis, we affirm the October 5, 2020 order of the Circuit Court of Raleigh County granting summary judgment for the Association and severing the Exemption Provisions from the Declaration.

We affirm the circuit court's October 6, 2020 order to the extent that it granted the Association's motion for summary judgment on the issue that the Utilities Loan was terminated on February 16, 2020 and that the Uniform Act applies to GSV. We reverse the circuit court's order to the extent that it determined that the Loan was invalid or void.

We also affirm the circuit court's related order dated October 23, 2020, finding that the Uniform Act applies and that Justice Holdings is the declarant of GSV.

Additionally, we affirm the circuit court's order dated July 19, 2021.

Finally, we reverse, in part, vacate, in part, and remand the circuit court's November 3, 2021 order granting summary judgment on counts V, VII, VIII, and IX to the Association for proceedings not inconsistent with this opinion.

Affirmed, in part, reversed, in part, vacated, in part, and remanded.